Samuel A. Schwartz, Esq.
Nevada Bar No. 10985
saschwartz@nvfirm.com
Athanasios E. Agelakopoulos, Esq.
Nevada Bar No. 14339
aagelakopoulos@nvfirm.com
Emily D. Anderson, Esq.
Nevada Bar No. 13814
eanderson@nvfirm.com
SCHWARTZ LAW, PLLC
601 East Bridger Avenue
Las Vegas, Nevada  89101
Telephone: (702) 385-5544
Facsimile: (702) 442-9887

*Attorneys for the Plaintiffs*

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF NEVADA

| | |
|---|---|
| In re: | Case No.: 22-10943-MKN |
| J AND J PURCHASING, LLC, | Chapter 11 – Involuntary |
| Alleged Debtor. | |
| ANTHONY BONIFAZIO, an individual; KEITH OZAWA, an individual; MARTIN KEEVIN CORDOVA, an individual; and BRIAN SCHUMANN, an individual | Adv. Proceeding No.: 22-01062-MKN |
| | Hearing Date: April 15, 2022 |
| Plaintiffs, | Hearing Time: 9:30 a.m. |
| v. | |
| JEFFREY J. JUDD, an individual; JENNIFER R. JUDD, an individual; JEFFREY J. JUDD AND JENNIFER J. R. JUDD, AS TRUSTEES OF JUDD NEVADA TRUST, DATED DECEMBER 15, 2020, a Nevada trust; J & J CONSULTING SERVICES, INC., an Alaska corporation; MATTHEW BEASLEY, an individual; PAULA BEASLEY, an individual; BEASLEY LAW GROUP PC, a Nevada Professional Corporation; SHANE M. JAGER, an individual, WILLOW A. JAGER, an | |

individual; KARSEN D. JAGER, an individual; )
SHANE M. JAGER AND WILLOW A. )
JAGER, AS TRUSTEES OF JAGER FAMILY )
TRUST, DATED JUNE 30, 2003, AMENDED )
JUNE 30, 2009, a Nevada trust; STIRLING )
CONSULTING L.L.C., a Nevada limited )
liability company; JASON JONGEWARD, an )
individual; JOHN CANNON, AS TRUSTEE )
OF THE CAROLINA CHASE TRUST, )
DATED __, a California trust, )
                                                                              )
                Defendants, )
                                                                              )
    and )
                                                                              )
J & J CONSULTING SERVICES, INC., a )
Nevada corporation; J and J PURCHASING, )
LLC, a Florida limited liability company, )
                                                                              )
            Nominal Defendants. )
_____ )

### AMENDED REPLY TO OPPOSITION TO MOTION FOR
### PRELIMINARY INJUNCTION AND TEMPORARY RESTRAINING ORDER

Plaintiffs Anthony Bonifazio, Keith Ozawa, Martin Keevin Cordova, and Brian Schumann (the "**Plaintiffs**"), by and through their attorneys of record, Schwartz Law, PLLC, hereby file this Reply (the "**Reply**") to Opposition (the "**Opposition**") (ECF No. 30) to Motion for Preliminary Injunction and Temporary Restraining Order (the "**Motion**"). In support of this Reply, the Plaintiffs respectfully state as follows:

### MEMORANDUM OF POINTS AND AUTHORITIES

1.      The underlying purpose of a temporary restraining order ("**TRO**") is to preserve the status quo and prevent irreparable harm before a preliminary injunction hearing is held. *Reno Air Racing Ass'n v. McCord*, 452 F.3d 1126, 1130-31 (9th Cir. 2006). The standard for issuing a TRO is substantially identical to the standard for issuing a preliminary injunction. *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001).

**A.    ALLOWING THE JUDD PARTIES TO TRANSFER THE REAL PROPERTY WOULD CONSTITUTE IRREPARABLE HARM ON THE PLAINTIFFS.**

2.    To obtain a preliminary injunction, a plaintiff must demonstrate that there exists a significant threat of irreparable injury.  *Oakland Tribune, Inc. v. Chronicle Pub. Co., Inc.*, 762 F.2d 1374, 1376 (9th Cir. 1985).  Plaintiffs seeking preliminary injunction relief must demonstrate that they are likely to suffer irreparable harm in the absence of preliminary relief.  *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1127 (9th Cir. 2009).  Harm is "irreparable" if it cannot be repaired.  *DVD Copy Control Ass'n, Inc. v. Kaleidescape, Inc.*, 176 Cal. App. 4th 697, 721, 97 Cal. Rptr. 3d 856, 876 (2009).  The irreparable harm must be "neither remote nor speculative, but actual and imminent."  *In re Int'l Home Products Inc.*, 491 B.R. 607, 627 (Bankr. D.P.R. 2013).

3.    The Judd Parties arguments about hearsay miss the point.  There are significant, meaningful accusations of fraud against Defendants, while the Judd Defendants actively attempt to sell multi-million dollar properties for large discounts.  Indeed, the Securities and Exchange Commission (the "**SEC**") filed a lawsuit against the Alleged Debtors, J. Judd, and S. Jager, among others for several counts of securities fraud.[1]  Plaintiffs simply want the Court to use injunctive relief to maintain the status quo while the parties conduct discovery to obtain the necessary admissible evidence to obtain a preliminary injunction.

**B.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR CLAIMS.**

4.    Only a ***reasonable probability of success*** is required to support a preliminary injunction.  *Gilder v. PGA Tour, Inc.*, 936 F.2d 417, 422 (9th Cir. 1991).  In fact, only a "fair chance on the merits" has been held sufficient for preliminary injunction purposes.  *Johnson v. Cal. State Bd. of Accounting*, 72 F.3d 1427, 1429 (9th Cir. 1995).  Thus, a Temporary Restraining Order shall issue where there is a reasonable probability that an applicant will ultimately prevail on the merits.  *See, e.g.*, *Jackson v. National Football League*, 802 F. Supp. 226 (D. Minn. 1992).  "In determining whether to award a preliminary injunction, the trial court must consider the

---

[1]    *See* Complaint, attached as **Exhibit 1**.

likelihood that the plaintiff will prevail on the merits and the possible harm to the parties from the granting or denial of the injunction." *Sierra On-Line, Inc. v. Phoenix Software, Inc.*, 739 F.2d 1415, 1421 (9th Cir. 1984). Still, probability of success should not be viewed in a vacuum – where the balance of harm tips decidedly in favor of plaintiff, "plaintiff need not show as robust a likelihood of success on the merits." *Id.*

5. The Judd Parties focus on the fact that, at this preliminary stage of the lawsuit, the Plaintiffs do not have evidence that J. Judd *knew* about the fraud. The Judd Parties, however, do not deny that they *benefited* from the fraud. Indeed, the Judd Parties own several real properties across Nevada, California, and Utah, all purchased during the time of the fraud. J. Judd does not deny that he has an interest in the Judd Trust, which currently owns and is attempting to sell several properties. Accordingly, with minimal discovery, Plaintiffs are likely to demonstrate that the Judd Parties, at a minimum benefited greatly from the fraud leaving them vulnerable to claims for fraudulent and preferential transfers.

## C. THE EQUITIES WEIGHT IN FAVOR OF ENJOINING THE SALES OF THE REAL PROPERTIES UNTIL AN EVIDENTIARY HEARING ON A PRELIMINARY INJUNCTION MAY BE HELD.

6. Injunctive relief requires a plaintiff to show that "the balance of equities tips in his favor and that an injunction is in the public interest." *Munaf v. Geren*, 128 S. Ct. 2207, 2219 (2008). In consideration of whether a temporary restraining order should be issued, the Court may also consider the public interest. *Winter v. Natural Res. Def. Council*, 129 S.Ct. 365, 374 (2008). "When the reach of an injunction is narrow, limited only to the parties, and has no impact on non-parties, the public interest will be 'at most a neutral factor in the analysis rather than one that favor[s] [granting or] denying the preliminary injunction. *Bernhardt v. L.A. County*, 339 F.3d 920, 931 (9th Cir. 2003).

7. Plaintiffs are part of a group of hundreds of investors who were defrauded by Defendant Matthew Beasley, as well as the Alleged Debtors and remaining Defendants. Plaintiffs were defrauded of almost two million dollars with total losses in the 9 figures.

8.      The Judd Parties argue, however, that the equities tip in their favor because an injunction would affect the third-party buyers intending to purchase the Property.  This is precisely why the Court must issue injunctive relief: the Property – the proceeds of the fraud – is being sold now and by the time the adversary complaint is adjudicated, any non-exempt assets will be gone.

9.      Therefore, the Court should enjoin the sales of the Real Property while the litigation proceeds in order to protect the Plaintiffs from irreparable harm as Plaintiffs are likely to succeed on the merits of their claims against the Defendants.

<u>CONCLUSION</u>

WHEREFORE, the Plaintiffs pray that this Court grant the Motion.

Dated this 14th day of April, 2022.

By: */s/ Samuel A. Schwartz*
Samuel A. Schwartz, Esq.
Nevada Bar No. 10985
Athanasios E. Agelakopoulos, Esq.
Nevada Bar No. 14339
Emily D. Anderson, Esq.
Nevada Bar No. 13814
SCHWARTZ LAW, PLLC
601 East Bridger Avenue
Las Vegas, Nevada  89101
*Attorneys for the Plaintiffs*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was sent electronically

via the Court's CM/ECF system on April 15, 2022, to the following:

KEVIN N. ANDERSON on behalf of Defendant JEFFREY J. JUDD AND JENNIFER J. R.
JUDD, AS TRUSTEES OF JUDD NEVADA TRUST, DATED DECEMBER 15, 2020
kanderson@fabianlaw.com,
sburdash@fabianvancott.com;mdonohoo@fabianvancott.com;amontoya@fabianvancott.com;tw
aite@fabianvancott.com

KEVIN N. ANDERSON on behalf of Interested Party JEFFREY JUDD
kanderson@fabianlaw.com,
sburdash@fabianvancott.com;mdonohoo@fabianvancott.com;amontoya@fabianvancott.com;tw
aite@fabianvancott.com

BRETT A. AXELROD on behalf of Interested Party DANIEL A. AYALA
baxelrod@foxrothschild.com, pchlum@foxrothschild.com;mwilson@foxrothschild.com

ALAN MAZA on behalf of Creditor U.S. SECURITIES AND EXCHANGE COMMISSION
mazaa@sec.gov, baddleyd@sec.gov

ALAN MAZA on behalf of Interested Party SECURITIES AND EXCHANGE COMMISSION
mazaa@sec.gov, baddleyd@sec.gov

TERESA M. PILATOWICZ on behalf of Other Prof. Peter Kravitz
tpilatowicz@gtg.legal, bknotices@gtg.legal

U.S. TRUSTEE - LV – 11
USTPRegion17.lv.ecf@usdoj.gov

I HEREBY CERTIFY that a true and correct copy of the foregoing was sent via

REGULAR MAIL on April 15, 2022, to the following:

| | |
|---|---|
| J&J Consulting Services, Inc. | |
| c/o its Registered Agent | J and J Purchasing, LLC |
| Nevada Corporate Agent Services, Inc. | c/o its Registered Agent |
| 2700 E. Sunset Road, Ste. 9 | Northwest Registered Agent, LLC |
| Las Vegas, NV  89120 | 7901 4th Street North |
| | Suite 300 |
| J&J Consulting Services, Inc. | St. Petersburg, FL  33702 |
| c/o Jennifer Judd, Secretary | |
| 9 Sky Arc Court | |
| Henderson, NV 89012 | |

Matthew Beasley
5475 Ruffian Road
Las Vegas, NV  89149

Paula Beasley
5475 Ruffian Road
Las Vegas, NV  89149

Beasley Law Group
c/o Matthew Beasley, President
5475 Ruffian Road
Las Vegas, NV 89149

Karsen D. Jager
16 Paradise Valley Court
Henderson, NV  89052

Willow A. Jager
16 Paradise Valley Court
Henderson, NV  89052

John Cannon, as Trustee of
The Carolina Chase Trust
15165 Ventura Blvd., Ste. 230
Sherman Oaks, CA 91403

Jason Jongeward
3084 Regal Court
Washington, UT 84780

Shane M. Jager and
Willow A. Jager, as Trustees of
Jager Family Trust, Dated June 30, 2003
And Amended June 30, 2009
16 Paradise Valley Court
Henderson, NV  89052

Stirling Consulting LLC
c/o its Registered Agent
Shane Jager
6785 S. Eastern Avenue
Unit 8
Las Vegas, NV  89119

/s/ Susan Roman
Susan Roman, an employee of
SCHWARTZ LAW, PLLC

# Exhibit 1

TRACY S. COMBS (California Bar No. 298664)
Email: combst@sec.gov
CASEY R. FRONK (Illinois Bar No. 6296535)
FronkC@sec.gov
Securities and Exchange Commission
351 South West Temple, Suite 6.100
Salt Lake City, UT 84101-1950
Tel.: (801) 524-5796
Fax: (801) 524-3558

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | Case No.: |
| Plaintiff, | |
| v. | **COMPLAINT** |
| MATTHEW WADE BEASLEY; BEASLEY LAW GROUP PC; JEFFREY J. JUDD; CHRISTOPHER R. HUMPHRIES; J&J CONSULTING SERVICES, INC., an Alaska Corporation; J&J CONSULTING SERVICES, INC., a Nevada Corporation; J AND J PURCHASING LLC; SHANE M. JAGER; JASON M. JONGEWARD; DENNY SEYBERT; and ROLAND TANNER; | |
| Defendants, | |
| THE JUDD IRREVOCABLE TRUST; PAJ CONSULTING INC; BJ HOLDINGS LLC; STIRLING CONSULTING, L.L.C.; CJ INVESTMENTS, LLC; JL2 INVESTMENTS, LLC; ROCKING HORSE PROPERTIES, LLC; TRIPLE THREAT BASKETBALL, LLC; ACAC LLC; ANTHONY MICHAEL ALBERTO, JR.; and MONTY CREW LLC; | |
| Relief Defendants. | |

1    Plaintiff, Securities and Exchange Commission (the "Commission"), alleges as follows:

2                                          **SUMMARY**

3        1.      This case concerns a long-running fraudulent offering of securities perpetrated by

4    Defendants Matthew Wade Beasley, Esq., his law firm Beasley Law Group PC ("Beasley Law

5    Group"), Jeffrey Judd, Christopher Humphries, and three entities that Judd controlled: J&J

6    Consulting Services, Inc. (a Nevada corporation), J&J Consulting Services, Inc. (an Alaska

7    corporation), and J and J Purchasing LLC (unless otherwise noted, collectively, the "J&J

8    Entities"), a scheme for which Judd, Humphries, and Defendants Shane M. Jager, Jason M.

9    Jongeward, Denny Seybert, Roland Tanner, and others acted as promoters.

10       2.      The scheme worked as follows:  from at least 2017 and continuing through March

11   2022, the J&J Entities offered investments in purported settlement contracts with tort plaintiffs

12   called "purchase agreements."  These investments in the so-called "purchase agreements"

13   constituted securities under federal law.  Judd, Humphries, and others told investors:

14              a.   that they could purchase interests in insurance tort settlements, and that the

15                   invested money was used to make advance payments to tort plaintiffs who had

16                   reached settlements with insurance companies for tort claims and who were

17                   willing to pay a premium to receive a portion of their settlement in advance

18                   rather than wait for payment from the insurance companies;

19              b.   that investors would receive returns on their investments of at least 12.5%

20                   every 90 days, for an annualized return of 50%, sometimes more, and that the

21                   investment had almost zero risk; and

22              c.   that Beasley and Beasley Law Group managed relationships with numerous

23                   personal injury attorneys around the country to maintain a supply of purchase

24                   agreements to the J&J Entities and their investors.

25       3.      From at least 2017 to March 2022, over 600 investors invested in the scheme, and

26   it appears that at least $449 million in investor funds flowed into the scheme through Beasley

27   Law Group's attorney trust ("IOLTA") account at Wells Fargo, N.A.  The amount that investors

                                               1

may have been paid in Ponzi payments is as yet unknown. During that time, Beasley and Judd acted as business partners in the J&J Entities and Beasley purported to act as an attorney for the J&J Entities.

4. In fact, the purchase agreements were fictitious, a fact which Beasley, Judd, and Humphries knew or were reckless in not knowing. Beasley, Beasley Law Group PC, Judd, and the J&J Entities did not use investor money to purchase interests in personal injury settlements, as Judd, Humphries, Jager, Jongeward, Seybert, and Tanner represented to actual and prospective investors.

5. Beasley, Judd, and others used a portion of investors' money to make periodic payments of fictitious "returns" on the purchase agreements to investors in a Ponzi-like fashion, but used the bulk of investor money to fund lavish lifestyles, including purchasing luxury homes and properties, a private jet, ATVs, boats, and numerous luxury cars for themselves and their relatives. Each of Judd, Humphries, Jager, Jongeward, Seybert, and Tanner recruited dozens, if not hundreds, of investors into the scheme and received transaction-based compensation for bringing in additional investors and more money from existing investors, even though none of them was a registered broker or dealer, nor associated with a broker or dealer, registered with the Commission.

6. On March 3, 2022, agents from the Federal Bureau of Investigation ("FBI") executed search warrants at the homes of Judd, Humphries, and Beasley. When agents arrived at Beasley's home, Beasley brandished a pistol and the agents shot him twice. Beasley then locked himself inside his home for nearly four hours. During that standoff, Beasley repeatedly confessed to an FBI negotiator that the J&J Entities' investment scheme was actually a Ponzi scheme that started in 2016 or 2017.

7. The Commission brings this action to halt Defendants' violations of the federal securities laws, prevent further harm to investors, and to seek disgorgement and civil penalties stemming from Defendants' wrongdoing, among other remedies.

**JURISDICTION AND VENUE**

8. The Commission brings this action pursuant to Sections 20(b) and 20(d) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77t(b) and (g)] and Sections 21(d) and (e) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78u(d) and (e)] to enjoin such acts, practices, and courses of business, and to obtain disgorgement, prejudgment interest, civil money penalties, and such other and further relief as this Court may deem just and appropriate.

9. This Court has jurisdiction over this action pursuant to Section 22 of the Securities Act [15 U.S.C. § 77v] and Section 27 of the Exchange Act [15 U.S.C. § 78aa].

10. Venue is proper in this Court pursuant to Section 27 of the Exchange Act [15 U.S.C. § 78aa] because Defendants and Relief Defendants are found, inhabit, and/or transacted business in the District of Nevada and because one or more acts or transactions constituting the violations alleged herein occurred in the District of Nevada.

11. Defendants were, individually and collectively, involved in the offer and sale of the securities, as that term is defined under Section 2(a)(1) of the Securities Act [15 U.S.C. § 77b(a)(1)] and Section 3(a)(10) of the Exchange Act [15 U.S.C. § 78c(a)(10)], issued by Defendants J&J Consulting Services, Inc., a Nevada corporation, J&J Consulting Services, Inc., an Alaska corporation, and J and J Purchasing LLC.

12. Defendants, directly or indirectly, made use of the mails or the means or instrumentalities of interstate commerce in connection with the conduct alleged in this Complaint.

**DEFENDANTS**

13. **Matthew Wade Beasley** ("Beasley"), age 49, is a resident of Las Vegas, Nevada. Beasley is President, Secretary, Treasurer, and Director of Beasley Law Group PC. Beasley has been licensed to practice law in Nevada since May 2006.

14. **Jeffrey Jason Judd** ("Judd"), age 50, is a resident of Henderson, Nevada. Judd is director, president, and treasurer of J & J Consulting Services, Inc. (Nevada) and director,

president, shareholder, and treasurer of J & J Consulting Services, Inc. (Alaska). Judd is a manager of J & J Purchasing, LLC. Judd personally promoted the "purchase agreement" investment scheme to multiple investors with false and misleading statements and omissions, and he compensated promoters who in turn found additional investors. On information and belief, Judd is a trustee of The Judd Irrevocable Trust.

15. **Christopher Ronn Humphries** ("Humphries"), age 48, is a resident of Henderson, Nevada. He personally promoted the "purchase agreement" investment scheme to multiple investors. He is a managing member of CJ Investments LLC.

16. **Beasley Law Group PC** ("Beasley Law Group") is a professional corporation organized in Nevada in 2011 with its principal place of business in Nevada. Beasley controls this entity.

17. **J&J Consulting Services, Inc.** is a Nevada corporation formed in 2005 with its principal place of business in Nevada ("J&J Nevada"). Judd controls this entity.

18. **J&J Consulting Services, Inc.** is also the name of an Alaska corporation, incorporated in 2019, with its principal place of business in Nevada ("J&J Alaska"). Judd controls this entity.

19. **J and J Purchasing LLC** ("J and J Purchasing") is a Florida limited liability company formed in October 2021 with its principal place of business in Nevada. Judd controls this entity.

20. **Shane Michael Jager** ("Jager"), age 47, is a resident of Henderson, Nevada. He personally promoted the Ponzi scheme to multiple investors and also recruited several additional promoters who worked under his supervision. He received compensation for the investments he procured. Jager is the managing member and owner of Stirling Consulting, L.L.C.

21. **Jason Myers Jongeward** ("Jongeward"), age 50, is a resident of Washington, Utah. Jongeward promoted the "purchase agreement" investment scheme to multiple investors and received compensation for the investments he procured. Jongeward is the governor of JL2 Investments LLC.

22.     **Roland Tanner** ("Tanner"), age 65, is a resident of Henderson, Nevada. He promoted the "purchase agreement" investment scheme to multiple investors and received compensation for the investments he procured.

23.     **Denny Seybert** ("Seybert"), age 44, is a resident of Henderson, Nevada. He promoted the "purchase agreement" investment scheme to multiple investors and received compensation for the investments he procured. He is the manager of Rocking Horse Properties, LLC.

## RELIEF DEFENDANTS

24.     **The Judd Irrevocable Trust** is a trust of unknown date and domicile, believed to be under the control of Matthew Beasley, Jeffrey Judd, and/or Jennifer Judd. On information and belief, Matthew Beasley is a trustee. The Judd Irrevocable Trust received at least $1.4 million in transfers from the Beasley Law Group IOLTA account at Wells Fargo, N.A. ("Beasley Law Group IOLTA"), which were proceeds from the fraud to which it has no legitimate claim.

25.     **PAJ Consulting Inc ("PAJ")** is a Nevada corporation formed in October 2019. Preston Judd, Jeffrey Judd's 22-year-old son, is the president, secretary, and treasurer. PAJ received over $990,000 from J&J Consulting Services, Inc. between June 2020 and February 2022, which were proceeds of the fraud to which PAJ has no legitimate claim. PAJ also received at least $824,500 from the Beasley Law Group PC IOLTA, which were proceeds from the fraud to which PAJ has no legitimate claim. PAJ's bank records suggest it has no legitimate business operations. It received large distributions of cash from J&J Consulting Services, Inc. and Beasley Law Group PC followed by lavish spending on, *e.g.*, travel, gambling, cryptocurrencies, shopping, and restaurants.

26.     **BJ Holdings LLC** is a Nevada limited liability company formed in March 2021. Its managing members are J&J Consulting Services, Inc. and Beasley Law Group, PC. On information and belief, BJ Holdings LLC holds assets that were purchased using investor funds, including a 2008 Hawker Beechcraft 900XP private jet. It received at least $500,000 in transfers

from the Beasley Law Group IOLTA, which are proceeds from the fraud to which it has no legitimate claim.

27.     **Stirling Consulting, L.L.C.** is a Nevada limited liability company formed in April 2018. Its principal place of business is Las Vegas, Nevada. Jager controls this entity. Stirling Consulting, L.L.C. received at least $30 million from the Beasley Law Group IOLTA account. On information and belief, these were proceeds from the fraud to which it has no legitimate claim.

28.     **CJ Investments LLC** is a Nevada limited liability company formed in November 2019. Its principal place of business is in Henderson, Nevada. Humphries and Jessica Humphries are both managing members of CJ Investments LLC. It received at least $25 million from the Beasley Law Group IOLTA account. On information and belief, these were proceeds from the fraud to which it has no legitimate claim.

29.     **JL2 Investments, LLC** is a Washington limited liability company formed in November 2019. Its principal place of business was initially Cheney, Washington. Upon information and belief, its principal place of business moved to Washington, Utah in 2021. Jongeward controls this entity. On information and belief, JL2 Investments received proceeds from the fraud to which it has no legitimate claim.

30.     **Rocking Horse Properties LLC** is a Nevada limited liability company formed in January 1997. Its principal place of business is in Nevada. Seybert controls this entity. It received over $690,000 from the Beasley Law Group IOLTA account. On information and belief, these were proceeds from the fraud to which it has no legitimate claim.

31.     **Triple Threat Basketball, LLC** is a Nevada limited liability company formed in April 2009. Its managers are Warren Rosegreen and Priscilla Rosegreen. It received transfers of over $9 million from the Beasley Law Group IOLTA account. On information and belief, these were proceeds from the fraud to which Triple Threat Basketball, LLC has no legitimate claim.

32.     **ACAC LLC** is a limited liability company of unknown domicile. A bank account in the name of ACAC LLC received at least $6.5 million from the Beasley Law Group IOLTA

account. On information and belief, these were proceeds from the fraud to which it has no legitimate claim.

33. **Anthony Michael Alberto, Jr.** ("Alberto"), age 34, is believed to be a resident of Nevada or Pennsylvania. He received nearly $4 million in transfers from the Beasley Law Group IOLTA account. Beasley confessed to an FBI negotiator that Alberto was his bookie and he used investor money to pay gambling debts he owed to Alberto. Alberto has received proceeds from the fraud to which he has no legitimate claim.

34. **Monty Crew LLC** was a Nevada limited liability company formed in January 2019. Its principal place of business was in Nevada. It became inactive in September 2021 and was revoked in February 2022. Its manager was Alberto. It received nearly $3 million in transfers from the Beasley Law Group IOLTA account. As stated in paragraph 33 above, Beasley confessed that the money paid to Alberto was proceeds from the fraud used to pay gambling debts. Money Crew LLC received investor money to which it has no legitimate claim.

## FACTS

## I. Judd, Humphries, and the J&J Entities Raised Money from Investors with False Representations of an Investment in Personal Injury Settlements.

35. Beginning at least as of January 1, 2017 and continuing until March 2022, the J&J Entities, directly and through Judd, Humphries, Jager, Jongeward, Seybert, and Tanner, offered investments in purported personal injury settlement contracts. Judd told investors that he had a litigation financing business with his attorney, Matthew Beasley, whereby Judd invested money in contracts with personal injury plaintiffs while Beasley procured those contracts through his contacts with other attorneys around the country. Judd told investors that Beasley and his law firm Beasley Law Group had relationships with personal injury attorneys whose clients had settlements with insurance companies, and who were willing to pay a premium to receive a portion of their settlement in advance rather than wait for payment from the insurance companies. Judd told investors that the J&J Entities entered into "purchase agreements" with the personal injury plaintiffs whereby the J&J Entities advanced to the personal injury plaintiffs a

portion of their expected insurance settlement payout, and the plaintiffs repaid the J&J Entities plus interest and fees when their insurance payout arrived.

36.     Judd told investors that the purchase agreements came in amounts of $80,000 or $100,000, with a term of 90 days, although he also said he allowed investors to split contracts with him or other investors if they wanted to invest less than $80,000. Judd told different investors that they would receive different returns. Judd told some investors that they would make up to $22,000 within 90 days on an investment of $100,000. Judd told other investors they would receive 12.5% on their investments (50% on an annual basis), for a return of $12,500 within 90 days on an investment of $100,000 or $10,000 within 90 days on an investment of $80,000.

37.     Judd told investors that at the end of the 90-day period, the J&J Entities would reinvest the principal in a new purchase agreement with a new tort plaintiff, and the investor could continue to receive his or her promised returns every 90 days. Judd told investors that they could get their principal back rather than reinvesting it at the end of the contract term if they chose.

38.     Judd told investors that the tort plaintiffs who entered the purchase agreements paid an administrative fee of $5,000, half of which went to Beasley and Beasley Law Group, and the other half of which went to the tort plaintiff's attorney.  Judd also told investors that Beasley and Beasley Law Group managed the relationships with the various personal injury attorneys and wrote the agreements with the personal injury plaintiffs, while Judd managed the investment side of the business with assistance from his son Parker Judd. On information and belief, Judd highlighted the fact that attorney Beasley was involved and that investor funds flowed through Beasley Law Group's IOLTA account.

39.     Judd told investors that the risk from investing in the purchase agreements was almost zero. Judd also told some investors that he would make good any investor loss, saying that he and Beasley had a separate fund to make investors whole if a personal injury plaintiff

failed to pay on a contract. He claimed he had "never had to use" this fund, because "we've never had one go bad."

40. Humphries, like Judd, promoted the J&J Entities investment scheme to numerous investors. Like Judd, Humphries told investors that the investment involved funding purchase agreements with personal injury plaintiffs who had settlements with insurance companies but wanted to obtain a portion of their money in advance. Humphries told investors that Matthew Beasley and his law firm Beasley Law Group managed the relationships with various attorneys to supply the purchase agreements to Judd and the J&J Entities. Humphries told investors that the purchase agreements were in amounts of $80,000 or $100,000 and paid returns of 13% every 90 days. Humphries told investors that their capital would be reinvested in a new purchase agreement at the expiration of each prior purchase agreement. Humphries told investors that there was little to no risk on the investment.

41. Humphries received compensation for bringing new investors into the scheme and for raising additional money from existing investors. He told one investor that he received 5% of the investor funds he raised and that he made around $250,000 every three months.

42. Judd and Humphries typically instructed investors to wire their investment money to Beasley Law Group's IOLTA account at Wells Fargo Bank N.A., but sometimes instructed investors to wire their investment money to other accounts as well, including an account in the name of J&J Consulting Services, Inc. at U.S. Bank, and an account in the name of Humphries' entity CJ Investments LLC.

**II.  Defendants' Representations Were Materially False and Misleading**

43. The foregoing representations made to investors by Judd, the J&J Entities, and Humphries were materially false and misleading. Judd and the J&J Entities did not invest the investors' funds in contracts with personal injury plaintiffs. Beasley and Beasley Law Group did not actually procure contracts with personal injury plaintiffs and their attorneys.

44. Beasley confessed on March 3, 2022 to an FBI negotiator that the business was a Ponzi scheme. Beasley and Judd returned a small portion of the invested money to investors in

Ponzi-type payments to meet investors' expectations of the promised percentages of returns every 90 days. These payments promoted investor confidence in the scheme, encouraged current investors to invest more money, and allowed Beasley, Judd, and Humphries to continue to find new victims.  In reality, Beasley, Judd, and Humphries used the majority of investor money for lavish personal expenses and to pay others to promote the scheme.

45.     To lend credibility to the scheme, Beasley created fake "purchase agreements" between J&J Consulting or J and J Purchasing and various purported injured tort plaintiffs and their attorneys, which were then shared with investors by Judd, Humphries and other promoters. Beasley often used the names of real attorneys from around the country (and sometimes even used the names of real personal injury tort plaintiffs) on the fake purchase agreements, but there were no actual underlying tort settlements and the attorneys whose names appeared on the fake purchase agreements had no actual connection to Beasley. An example of one of these "purchase agreements" is attached as **Exhibit A**.

46.     Until approximately December 2020, Judd provided investors "Investment Agreements" or "Buyer Agreements" purporting to memorialize the investor's investment in a tort plaintiff's purchase agreement. The agreements were between the investor, and Judd and J&J Consulting Services, Inc. An example of one of the "Investment Agreements" is attached as **Exhibit B**. An example of one titled a "Buyer Agreement" is attached as **Exhibit C.** These agreements were signed by Judd.

47.     In approximately October 2021, Judd began telling investors that he was making modifications to the business at the suggestion an attorney who conducted a review of the business. As part of these purported business modifications, Judd formed J and J Purchasing LLC in October 2021 and started operating the investment business through J and J Purchasing. In approximately December 2021, as part of the business modifications, Judd started requiring investors to sign new documentation with J and J Purchasing: a Confidential Private Placement Memorandum ("PPM"); a Non-Compete, Non-Disclosure and Non-Solicitation Agreement; a Mutual Confidentiality and Non-Disclosure Agreement, and a Confidential Subscription

Agreement. Judd personally distributed these documents to some investors, and the Promoter

Defendants and other promoters distributed copies to their investors. A copy of the PPM is

attached as **Exhibit D.**

48.     Judd and Humphries told investors that Beasley managed the relationship with the

personal injury attorneys and, on information and belief, told investors that they were not

allowed to contact the attorneys or plaintiffs whose names appeared on the purchase agreements.

This kept investors from learning that the attorneys and plaintiffs on the purchase agreements

were not actually parties to the purchase agreements, and that the purchase agreements were

fake.

49.     Despite this admonition from Judd and Humphries, some investors contacted the

attorneys named in the purchase agreements to inquire whether the purchase agreements were

real, only to discover that the attorneys had no such personal injury clients and no relationship

with Matthew Beasley or Beasley Law Group.

**III.     Beasley, Beasley Law Group, Judd, the J&J Entities, and Humphries Acted With**
**        Scienter**

50.     Defendants Beasley, Beasley Law Group, Judd, the Judd Entities, and Humphries

knowingly or recklessly engaged in the fraudulent scheme detailed in the paragraphs above.

51.     On March 3, 2022, when the FBI attempted to serve a search warrant at his home,

Beasley engaged in a standoff for approximately four hours with FBI agents, during which

Beasley spoke by telephone with an FBI negotiator. In the recorded calls with the FBI negotiator,

Beasley repeatedly confessed that the J&J investment was a Ponzi scheme that he started in 2016

or 2017. He confessed that the purchase agreements were fake and he used the names of

attorneys he did not know on the purchase agreements.

52.     Beasley confessed that investors were promised that their investment money

would be given to someone who had settled a personal injury case but had not received their

settlement money yet. He confessed that he "got names of attorneys" for the scheme but "I never

actually talked to them." He confessed that as Jeffrey Judd found more investors, "I made up

more attorney's deals and just kept growing it." Beasley confessed that investors "would give their money to me, and I would supposedly send it to a bunch of attorneys" but actually "I kept it and used it to pay, basically pay them back to pay off gambling debts."

53.     Judd knew or was reckless in not knowing that the purchase agreements were fake and that the investment scheme was a fraud.  Judd, as Beasley's business partner in the scheme for over seven years, either knew that the business was a fraud, or was reckless in not knowing. Judd worked intimately with Beasley throughout the entire scheme. Judd told investors that he and Beasley operated the business together and that Beasley was his attorney. Judd told at least one investor that he saw bank statements and other documentation from Beasley.  Had Judd reviewed the bank statements of the Beasley IOLTA account—where, on information and belief, he knew investor funds were aggregated—he would have readily seen that the investment scheme was not a legitimate business and that there were very few, if any, proceeds of personal injury tort settlements pursuant to the purchase agreements flowing into the account.

54.     Further, the J&J Entities, which Judd controlled, were the counterparties on all the purported purchase agreements and Judd supposedly signed them on behalf of his entities. As of February 24, 2022, Judd boasted that he had $475 million "under management," was doing 450 contracts per week, and had done over 16,000 contracts to date. Judd either knew or was reckless in not knowing that the purported counterparties on those 16,000 contracts did not actually enter the agreements. Judd knew the purchase agreements were never signed by the purported counterparties, or he recklessly disregarded that fact. Had Judd conducted the most basic of due diligence on the fake purchase agreements and the flow of funds to and from Beasley Law Group, it would have revealed the scheme.

55.     Upon information and belief, Humphries also knew or was reckless in not knowing that the purchase agreement investment scheme was a fraud.  Upon information and belief, Humphries was at least aware of indicia that the tort settlements at issue in the investment were fictitious and acted to hide that fact from investors.

56.     Judd and Humphries acted to hide the fraud from investors by telling them that they were prohibited from contacting the parties to the purchase agreements.  Over the years, despite being told not to do so, several investors contacted the attorneys listed on the purchase agreements and the attorneys denied having such clients or entering the purchase agreements. On information and belief, this information made its way back to the promoters, including Humphries, and ultimately to Judd himself. Various investors pushed their promoters, Judd, and the J&J Entities to answer questions about the inability to verify that the purchase agreements were real, or asked to see documentation such as bank statements showing actual money flows to the purported counterparties on the purchase agreements. When promoters confronted Judd and the J&J Entities about the fact that attorneys on the purchase agreements denied that the purchase agreements were legitimate, Judd hid the fraud by stating to investors that the law firms were probably denying the existence of the contracts simply due to client confidentiality concerns.

57.     At least as early as 2019, Judd started requiring investors to enter non-disclosure agreements as a condition of investing. Judd and his promoters also often required investors to sign a document saying that they were prohibited from contacting any parties related to the personal injury settlement or purchase agreement without the written consent of Jeffrey Judd. Also, the "Investor Agreement" and "Buyer Agreement" documents (Exs. B and C hereto) expressly prohibited investors from contacting the parties on the purchase agreements without Judd's consent.

58.     Ultimately, on or around January 2022, Judd and certain of his promoters decided to stop sending the fake purchase agreements to investors altogether. Judd gave investors the excuse that his "attorneys" had advised him to stop sending the purchase agreements to them.

59.     On information and belief, Judd required investors to sign the document prohibiting them from contacting the parties related to the personal injury settlement or purchase agreement, and ultimately stopped disseminating the fake purchase agreements, because he was attempting to hide their fictitious nature from investors.

60.     Despite that they knew or were reckless in not knowing that the Purchase Agreements were fake, Humphries and Judd nonetheless continued to solicit new investors and additional investments from existing investors.

**IV.    Defendants Judd, Humphries, Jager, Jongeward, Seybert, and Tanner Violated the Federal Securities Laws by Acting as Unregistered Brokers.**

61.     In addition to Humphries, Judd had several other promoters working underneath him to locate new investors and funnel investment money into the J&J Entities scheme. Defendants Jager, Jongeward, Seybert, and Tanner were among these promoters.

62.     Jager, Jongeward, Seybert, and Tanner, like Judd and Humphries, each solicited dozens of investors to invest in the purchase agreements and received transaction-based compensation in return. The investors' interests in the purchase agreements issued by the J&J Entities—which Judd, Jager, Jongeward, Seybert, and Tanner solicited investors to buy— constituted securities as that term is defined under the federal securities laws.

63.     In 2020, Humphries stated to at least one investor that he personally made $250,000 every three months from his investor solicitations and received a 5% commission on investments he solicited.

64.     Jongeward also made a percentage on each investment he obtained on behalf of the J&J Entities. In early 2022, Jongeward stated to at least one prospective investor that he personally "managed" over 150 investors and about $52 million in investment funds, that this was his "full-time job," and that he had been doing it for two years.

65.     In early 2022, Jager stated to at least one prospective investor that he had been soliciting investors for the J&J Entities investment for five years, had solicited 250 investors, and that he and Jongeward together had raised over $200 million from investors for the J&J Entities. Jager also stated to at least one prospective investor that Judd had negotiated a rate of payment to Jager and Jongeward on the investments they raised, and that Tanner worked "under Jager" soliciting investments in the purchase agreements. Judd, Jager, Jongeward, Seybert, and Tanner each used means or instrumentalities of interstate commerce to solicit and sell securities as part

of their regular business. Judd, Jager, Jongeward, Seybert, and Tanner each used the internet to solicit investors, transferred cash through wire transfers, and used email and telephone to negotiate and effect sales transactions.

66. Humphries, Jager, Jongeward, and Seybert also handled investor funds. While investor funds typically (but not always) flowed into Beasley Law Group's IOLTA account, the payments of purported "returns" to investors whom Humphries, Jager, Jongeward, and Seybert recruited would flow from accounts held by Beasley Law Group or the J&J Entities into bank accounts for entities controlled by Humphries, Jager, Jongeward, and Seybert. From there, Humphries, Jager, Jongeward, and Seybert would distribute purported "returns" to investors they had solicited. Sometimes Humphries, Jongeward, and Seybert also instructed investors to wire their investment money directly to the accounts in the names of the entities they controlled rather than to Beasley Law Group's account.

67. Jager used an account in the name of his entity Stirling Consulting, L.L.C., and possibly others, to receive investor funds and also to distribute purported "returns" to investors. Humphries used an account in the name of CJ Investments LLC and JCH Consulting, L.L.C., among others, to receive investor funds and also distribute Ponzi payments to his investors. Jongeward used an account in the name of his entity JL2 Investments LLC, and possibly others, to receive investor funds and to distribute Ponzi payments to his investors. Seybert used an account in the name of his entity Rocking Horse Properties, LLC, and possibly others, to receive investor funds and distribute purported returns to his investors. Tanner used an account in the name of Anthem Assets, LLC, and possibly others, to receive investor funds and distribute purported returns to his investors. On information and belief, Jager, Humphries, Jongeward, Seybert, and Tanner also received commission payments for their investor solicitations in the accounts of those entities that they controlled.

68. Tanner solicited numerous investors for the J&J Entities scheme over a period of many months or years. In early 2022, Jager represented to prospective investors that Tanner worked under his supervision to solicit additional investors for the J&J Entities investment and

that Tanner had raised over $50 million for the J&J Entities. On information and belief, Tanner and received transaction-based compensation for the investors and investments he solicited.

69.     At all relevant times while Judd, Jager, Jongeward, Seybert, and Tanner engaged in soliciting investors to buy interests in the purchase agreements in exchange for transaction-based compensation, none of them were registered with the Commission as a broker or dealer, nor were they associated with a broker or dealer registered with the Commission.

**V.      The Securities Offered and Sold Were Not Registered**

70.     The securities offered and sold by Judd, Humphries, Jager, Jongeward, Seybert, and Tanner were not registered with the Commission.

71.     J and J Purchasing LLC filed a Form D on December 13, 2021, purporting to give notice of an exempt offering under Rule 506(b), but the J&J Entities' offers and sales of securities were not exempt under Rule 506(b) because, among other things, investors were never provided with the required disclosures of information under Rule 502(b) [17 CFR § 230.502].  In addition, the Form D was itself false and misleading in its description of, *inter alia*, the investment and the use of investor funds.

**FIRST CLAIM FOR RELIEF**

**Violations of Section 5(a) and (c) of the Securities Act [15 U.S.C. § 77e(a) and (c)]**

***(Against All Defendants)***

72.     The Commission re-alleges and incorporates by reference each and every allegation in paragraphs 1–71, inclusive, as if they were fully set forth herein.

73.     Defendants Beasley, Beasley Law Group, Judd, the J&J Entities, Humphries, Jager, Jongeward, Seybert, and Tanner, by engaging in the conduct described above, directly or indirectly,

   a.   made use of means or instruments of transportation or communication in interstate commerce or of the mails to sell securities, as to which no registration statement was in effect, through the use or medium of any prospectus or otherwise;

16

b. carried or caused to be carried through the mails or in interstate commerce, by any means or instrument of transportation, securities as to which no registration statement was in effect, for the purpose of sale or for delivery after sale; and

c. made use of any means or instruments of transportation or communications in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise securities as to which no registration statement had been filed.

74. In regard to the sale of securities described herein, no exemption validly applied to the registration requirements described above.

75. By reason of the foregoing, Defendants Beasley, Beasley Law Group, Judd, the J&J Entities, Jager, Jongeward, Humphries, Seybert, and Tanner violated, and unless enjoined, will continue to violate, Sections 5(a) and (c) of the Securities Act [15 U.S.C. § 77 e(a) and (c)].

### SECOND CLAIM FOR RELIEF

**Violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)(1)]**

*(Against Beasley, Beasley Law Group, Judd, the J&J Entities, and Humphries)*

76. The Commission re-alleges and incorporates by reference each and every allegation in paragraphs 1–75, inclusive, as if they were fully set forth herein.

77. By engaging in the conduct described above, Beasley, Beasley Law Group, Judd, the J&J Entities, and Humphries, and each of them, directly or indirectly, individually or in concert with others, in the offer and sale of securities, by use of the means and instruments of transportation and communication in interstate commerce or by use of the mails,

a. employed devices, schemes, or artifices to defraud;

b. obtained money or property by means of untrue statements of material fact or omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

c.   engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit.

78.    With respect to violations of Section 17(a)(1) of the Securities Act, each of Defendants Beasley, Beasley Law Group, Judd, the J&J Entities, and Humphries engaged in the above-referenced conduct knowingly or with severe recklessness.

79.    With respect to violations of Sections 17(a)(2) and (a)(3) of the Securities Act, each of Defendants Beasley, Beasley Law Group, Judd, the J&J Entities, and Humphries engaged in the above-referenced conduct was at least negligent in its/his conduct and in making the untrue and misleading statements alleged herein.

80.    By reason of the foregoing, Beasley, Beasley Law Group, Judd, the J&J Entities, and Humphries violated and, unless enjoined, will continue to violate Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

## THIRD CLAIM FOR RELIEF

**Violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Exchange Act Rule 10b-5 [17 C.F.R. § 240.10b-5]**

*(Against Beasley, Beasley Law Group, Judd, the J&J Entities, and Humphries)*

81.    The Commission re-alleges and incorporates by reference each and every allegation in paragraphs 1–80, inclusive, as if they were fully set forth herein.

82.    By engaging in the conduct described above, Beasley, Beasley Law Group, Judd, the J&J Entities, and Humphries, directly or indirectly, individually or in concert with others, in connection with the purchase or sale of securities, by use of the means and instrumentalities of interstate commerce or by use of the mails,

a.   employed devices, schemes, and artifices to defraud;

b.   made untrue statements of material facts and/or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

c. engaged in acts, practices, and course of business which operated as a fraud and deceit upon purchasers, prospective purchasers, and other persons.

83. Each of Beasley, Beasley Law Group, Judd, the J&J Entities, and Humphries engaged in the above-referenced conduct and made the above-referenced untrue and misleading statements knowingly or with severe recklessness.

84. By reason of the foregoing, each of Beasley, Beasley Law Group, Judd, the J&J Entities, and Humphries have violated and, unless enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Exchange Act Rule 10b-5 [17 C.F.R. § 240.10b-5].

## FOURTH CLAIM FOR RELIEF

### Violations of Section 15(a)(1) of the Exchange Act [15 U.S.C. § 78o(a)(1)]
### *(Against Judd, Humphries, Jager, Jongeward, Seybert, and Tanner)*

85. The Commission re-alleges and incorporates by reference each and every allegation in paragraphs 1–84, inclusive, as if they were fully set forth herein.

86. By engaging in the conduct described above, Judd, Humphries, Jager, Jongeward, Seybert, and Tanner, and each of them:

a. engaged in the business of effecting transactions in securities for the account of others; and

b. directly or indirectly, made use of the mails or the means or instrumentalities of interstate commerce to effect transactions in, or to induce or attempt to induce the purchase or sale of, securities without being registered as a broker or dealer with the Commission or associated with a broker or dealer registered with the Commission.

87. By reason of the foregoing, Judd, Humphries, Jager, Jongeward, Seybert, and Tanner each violated, and unless enjoined will continue to violate, Section 15(a)(1) of the Exchange Act [15 U.S.C. §78o(a)(1)].

**FIFTH CLAIM FOR RELIEF**

**Equitable Disgorgement**

*(Against All Relief Defendants)*

88.     The Commission re-alleges and incorporates by reference each and every allegation in paragraphs 1–87, inclusive, as if they were fully set forth herein.

89.     Each of the Relief Defendants named in paragraphs 24-34 above obtained money, property, and assets as a result of the violations of the securities laws by Beasley, Beasley Law Group, Judd, the J&J Entities, and Humphries, to which they have no legitimate claim.

90.     Each of the Relief Defendants should be required to disgorge all ill-gotten gains which inured to their benefit under the equitable doctrines of disgorgement, unjust enrichment and constructive trust.

**PRAYER FOR RELIEF**

WHEREFORE, the Commission respectfully requests that this Court enter a final judgment:

**I.**

Permanently restraining and enjoining all Defendants from, directly or indirectly, engaging in conduct in violation of Section 5 of the Securities Act [15 U.S.C. § 77e(a)(1)];

**II.**

Permanently restraining and enjoining Defendants Beasley, the Beasley Law Group, Judd, the J&J Entities, and Humphries from, directly or indirectly, engaging in conduct in violation of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Exchange Act Rule 10b–5 thereunder [17 C.F.R. § 240.10b–5];

**III.**

Permanently restraining and enjoining Defendants Judd, Humphries, Jager, Jongeward, Seybert, and Tanner from, directly or indirectly, engaging in conduct in violation of Section 15(a)(1) of the Exchange Act [15 U.S.C. § 78o(a)(1)];

**IV.**

Permanently restraining and enjoining each of Defendants Beasley, Beasley Law Group, Judd, and the J&J Entities from, directly or indirectly, including, but not limited to, through any entity owned or controlled by each, the issuance, purchase, or sale of any security related to settled litigation claims, except for the purchase or sale of securities listed on a national securities exchange by these Defendants for their own personal accounts;

**V.**

Permanently restraining and enjoining each of Defendants Judd, Humphries, Jager, Jongeward, Seybert, and Tanner from, directly or indirectly, including, but not limited to, through any entity owned or controlled by each, soliciting any person or entity to purchase or sell any security;

**VI.**

Ordering Defendants and Relief Defendants to disgorge all ill-gotten gains or unjust enrichment derived from the activities set forth in this Complaint, together with prejudgment interest thereon;

**VII.**

Ordering all Defendants to pay a civil penalty pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)];

**VIII.**

Retaining jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court; and,

**IV.**

Granting such other and further relief as this Court may deem just, equitable, or necessary in connection with the enforcement of the federal securities laws and for the protection of investors.

Dated:  April 12, 2022.

Respectfully submitted,

**SECURITIES AND EXCHANGE COMMISSION**


*/s/ Tracy S. Combs*
Tracy S. Combs
Casey R. Fronk
Attorneys for Plaintiff
Securities and Exchange Commission